UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHANNON DIKKER,

        Plaintiff,

v.

5-STAR TEAM LEASING, LLC, et al.,

        Defendants.
_____/

CASE NO. 1:15-CV-1201

HON. ROBERT J. JONKER

## OPINION AND ORDER

This is a wage and hour case. Plaintiff Shannon Dikker asserts that Defendants K&M Northfield Dodge, Inc., and 5-Star Team Leasing, LLC failed to pay her minimum wage and overtime for work she performed. Dikker also claims Defendants failed to pay commissions due, and ultimately fired her in retaliation for her wage and hour complaints. Defendants respond that they paid everything which Plaintiff was due and did not terminate her at all, let alone in retaliation for any complaints she made. After a bench trial, the Court concludes that Plaintiff has failed to establish her claims, and that Defendants are entitled to judgment in their favor. This Opinion and Order constitutes the Court's findings of facts and conclusions of law under Federal Rule of Civil Procedure 52.

### I.  BACKGROUND

Dikker worked for K&M Northfield Dodge, Inc. ("K&M") for less than a year, from March 2014 until January 12, 2015. From March to May of 2014, she worked hourly in the collision department. From August of 2014 until January 2015, she worked on commission in fleet sales.

Between May and August of 2014 she trained with Heidi Peila, who was planning to leave K&M and whose position Dikker was meant to fill in fleet sales. During the training period, Dikker continued to work on an hourly basis. Dikker and Peila's work for K&M was all on a part-time basis.

K&M is an automobile dealership that sells and repairs new and used cars. Defendant 5-Star Team Leasing, LLC (collectively, with K&M, "Defendants") is the payroll company for all the employees of K&M. K&M employs about 110 employees. Most employees work on commission. The remaining positions are administrative and receive hourly-based pay. Missy Willman is the business manager of K&M and the owner of 5-Star Team Leasing.

Beginning in late March 2014, Dikker worked as a receptionist in the collision department at K&M. She typically put in fifteen hours a week in that position. Plaintiff received an hourly wage of $10 per hour for processing paperwork and for training time. Once Dikker finished training in August 2014, she worked exclusively on commissions. Her job involved brokering car sales between Fiat-Chrysler and small car rental agencies nationwide. Dikker sold the cars directly from the manufacturer to the buyer. The commission schedule at K&M was the same one that applied to her predecessors: namely, $25 per vehicle at the time of the order; and $40 at the time of delivery following completion of all paperwork.

Unlike her predecessor, Dikker did not always earn enough on commission to cover minimum wage for her time worked. K&M addressed this problem by grossing up her compensation to cover any shortfall so that Dikker always received at least minimum wage for her time during pay periods when her commissions fell short. For this purpose, the company maintained a computer time-keeping system. Employees, including Dikker, were responsible for logging their hours on this system and could review the time entries before they were processed by the payroll department.

Dikker could log onto this system from her computer or from three other terminals at K&M. Dikker had a very flexible work schedule to accommodate her child care responsibilities. In fact, she generally clocked in and out of the system based on her own schedule. The evidence reflects that Dikker used the time-keeping system and on multiple occasions during her employment asked payroll to make changes to her recorded time. In each instance, the requested changes were in favor of Dikker. In each instance, during her employment, Defendants made the requested change for Dikker.[1]

K&M's recorded policies reflect this pay arrangement. Kim Magoon, K&M's payroll manager, provided Dikker with K&M's employee handbook when she was hired. Dikker acknowledged that she received the handbook by signing the acknowledgment form on March 27, 2014, which Magoon also signed as a witness. The handbook describes the computer time-keeping system and requires employees to punch in when they arrive at work, punch in and out for lunch, and punch out when they leave. Most importantly, the handbook provides that if an employee works other than normally scheduled time, a company supervisor must authorize and override the employee's time. The written policy leaves no ambiguity: every employee was responsible for using the system to ensure accurate time-keeping.

This time-recording arrangement was also carried out in practice. In August 2014, Willman instructed Dikker to record all her hours, as the written policy required. Willman explained the pay structure and time-recording system to Dikker, consistent with the written policy. Dikker understood how both worked. Dikker acknowledged during trial that she made corrections to her time sheets

---

[1] The Defendants did not make the change Dikker requested after she left Defendant's employ.

whenever she noticed mistakes; that K&M would make corrections whenever she asked; and that Defendants never refused to record time she reported working. This was corroborated by several recorded instances of Dikker's requests for corrections to her time sheets submitted on paper and through emails to Willman and Magoon. Some of these corrections were made the same day Dikker recorded the hours, but others were made after paychecks had already been issued. They were always in favor of Dikker.

The only evidence at trial that in any way detracted from this was from Dikker herself. She testified that she was told to record only her administrative time, and not the time spent on sales, even after switching to the commission-based job. The Court expressly rejects this testimony as incredible and contrary to the overwhelming evidence of a consistent policy and practice on time-keeping. There are no contemporaneous documents that distinguish in any way between sales time and administrative time. Nor do Dikker's own time-keeping entries show a materially different pattern of time-keeping before and after the job change. There is surely nothing in her contemporaneous time-keeping records that evidence the kind of chess clock "on again" and "off again" that would have been required if Dikker's testimony were credited.

Dikker was not doing nearly as well financially as she had hoped to do in the sales job. Nor was she doing as well as her predecessors in the position. There were multiple pay periods where her commissions were insufficient to cover her minimum wage, and so the company grossed up her pay to cover the shortfall. Dikker still felt, however, that she needed to make more money, to support herself and her child. Ultimately, she arranged to meet with Paul Vredeveld, the general sales manager at 5-Star Leasing, and Willman. She set the meeting for January 12, 2015. Dikker opened the meeting by saying: "I'll make this easy, I'm quitting." Willman and Vredeveld responded that

they were "on the same page." The quitting was not particularly surprising because Dikker had made no secret of her desire to make more money, and her disappointment that the commissions were not coming in as they had for her predecessor. She reiterated some of this disappointment at the meeting. What she did not do, however–not at the meeting on January 12, or at any other earlier time–is complain that Defendants were failing to pay her what they promised, or what the law required. Disappointment with pay is not the same thing as protected conduct complaining about wage and hour, or commission requirements.

On November 18, 2015, Dikker filed her Complaint in this Court, alleging violations of the Fair Labor Standards Act and the Michigan Workforce Opportunity Wage Act (MCL 408.411, *et seq*). Dikker also brings claims for commissions based on Michigan common law and the Michigan Sales Representative Commissions Act ("MSRCA") (MCL § 600.2961).

## II. LEGAL STANDARDS AND ANALYSIS

A. <u>Fair Labor Standards Act</u>

The Fair Labor Standards Act requires employers to pay the federal minimum wage and provide overtime pay to covered employees under the Act's overtime provisions. *See Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 161, 167 (1945). Section 206 currently requires employers to pay employees wages at $7.25 an hour. 29 U.S.C. § 206(a)(1).[2] Section 207 requires employers to compensate any covered, non-exempt employee who works more than forty hours per workweek for "employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). If the employer violates the FLSA

---

[2] Michigan minimum wage is currently $8.90 an hour. During Dikker's employment, the minimum wage in Michigan was either $7.40 an hour or $8.15 an hour. Defendants always used the highest applicable minimum wage to gross up any shortfall in Plaintiff's commissions.

by failing to pay the minimum wage or overtime compensation to an employee covered by the Act, the employer is "liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Here, it is undisputed by the parties that Plaintiff is a "covered, non-exempt employee" under the FLSA and that Defendant is an "employer" for purposes of the FLSA.

*1.     Duty to Keep Adequate and Accurate Records*

Under the FLSA, it is the employer's duty to keep and preserve records of its employees' wages and hours. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2. Therefore, if the employee proves that the employer has failed to maintain adequate and accurate wage and hour records, the burden of proving a violation of the FLSA is altered. *Herman v. Palo Group Foster Home, Inc.*, 976 F. Supp. 696, 701 (W.D. Mich. 1997).

In such a case, an employee may establish a prima facie case of minimum wage or overtime violations by producing "sufficient evidence to show the amount and extent of [her] work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946), *superseded by statute on other grounds*, Portal-to-Portal Act of 1947, 29 U.S.C. § 254(a), *as recognized in Integrity Staffing Solutions, Inc. v. Busk*, 135 S. Ct. 513, (2014). "Once the employee establishes a prima facie case, the burden shifts back to the employer to rebut the number of hours alleged by presenting specific evidence disproving those hours." *Peterson v. Snodgrass*, 683 F. Supp. 2d 1107, 1126 (D. Or. 2010) (citing *Brock v. Seto*, 790 F.2d 1446, 1447-48 (9th Cir. 1986)).

The FLSA requires covered employers to keep records of each employee's wages, hours and the conditions and practices of employment in compliance with the regulations promulgated by the

6

DOL's Wage and Hour Division under 29 C.F.R. Part 516. 29 U.S.C. § 211(c). Under those regulations, an employer is required to maintain accurate records of the number of hours worked each workday and workweek by each employee. 29 C.F.R. § 516.2(a)(7) (1996).

Here, Dikker has not met her burden to demonstrate that Defendants failed to keep adequate records of time worked. Defendants showed that K&M had an established procedure for recording time published in its Employee Handbook. This procedure involved a computer time-keeping system with three terminals where employees could log on at K&M to report their time. Dikker used the system. Moreover, Dikker admits that she made corrections whenever she noticed any mistakes in the time-keeping records; that Defendants made corrections to her time sheets whenever she requested; and that Defendants never refused to report time she worked. Dikker has failed to establish that Defendants failed to maintain adequate and accurate time records and her burden of proving a violation of the FLSA by Defendants is therefore not altered.

## 2. Duty to Provide Adequate Compensation

If the employee cannot establish that the employer failed to maintain adequate and accurate records, the employee must meet two requirements to establish a violation of the FLSA. *Davis v. Food Lion*, 792 F.2d 1274, 1277 (6th Cir. 1986). The employee "must prove by a preponderance of the evidence that he or she 'performed work for which he [or she] was not properly compensated.'" *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999) (quoting *Anderson*, 328 U.S. at 686-87). "Work not requested but suffered or permitted is work time" for which the employer is liable. 29 C.F.R. § 785.11; *see also Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 718 (2d Cir. 2001) ("[A]n employee must be compensated for time she works outside of her scheduled shift, even if the employer did not ask that the employee work during that time[.]"). "Time

spent predominantly for the employer's benefit during a period, although designated as a lunch period or under any other designation, nevertheless constitutes working time compensable under the provisions of the [FLSA]." *F.W. Stock & Sons, Inc. v. Thompson*, 194 F.2d 493, 496-97 (6th Cir. 1952) (citation and internal quotation marks omitted).

The employee must also establish that the employer had actual or constructive knowledge of the fact that the employee was not paid minimum wage or overtime for work performed. *Monroe v. FTS USA, LLC*, 763 F. Supp. 2d 979, 986 (W.D. Tenn. 2011). "[C]onstructive knowledge exists when the employer 'should have discovered it through the exercise of reasonable diligence.'" *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 391 (6th Cir. 2016) (quoting *Carlisle Equip. Co. v. U.S. Sec'y of Labor & Occupational Safety*, 24 F.3d 790, 793 (6th Cir. 1994)). "[W]here an employer has no knowledge that an employee is engaging in overtime work and that an employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of . . . [the FLSA]." *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981).

"Whether a party had the requisite knowledge [under FLSA] is a question of fact." *Craig*, 823 F.3d at 391 (citing *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 521 (2d Cir. 1998)). "[I]f an employer establishes a reasonable process for an employee to report uncompensated work time, the employer is not liable for non-payment if the employee fails to follow the established process." *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 872 (6th Cir. 2012). Nonetheless, employers who "prevent[] the employees from reporting overtime or [are] otherwise notified of the employees' unreported work" are still liable for unpaid wages. *Id.* at 867. However, "[a]ccess to records

8

indicating that employees were working overtime . . . is not necessarily sufficient to establish constructive knowledge." *Hertz v. Woodbury Cty.*, 566 F.3d 775, 781-82 (8th Cir. 2009).

Dikker has failed to prove her claim by a preponderance of the evidence. To the contrary, the Court is satisfied that Defendants paid Dikker for all time she worked, consistent with wage and hour law. Dikker recorded her time as required by company policy, both before and after taking on the commissioned sales job. The Defendants paid her for all recorded time. Defendants also paid her for corrections Dikker said were needed when she under reported her time for one reason or another. And Defendants grossed up her pay to make sure she received at least minimum wage for pay periods during which her commissions fell short. Both the policy and practice of the company generally, and in Dikker's case specifically, demonstrates this. Dikker received all the pay to which she was entitled under wage and hour law.

Dikker's claim that she under reported her hours because Defendants told her to record only "administrative time," and not her sales time, is incredible and the Court rejects it. First, the written policy of the Defendants is directly to the contrary. It requires all employees to record all their time. Dikker knew that and acknowledged receipt of the written policy. Second, Dikker's own practice confirms she understood and tried to follow the policy. On several occasions, she told Defendants that her hours were mistakenly under reported. Each time, the Defendants accepted her explanation and paid her for the extra time. Not once did Dikker ever try to distinguish "administrative time" from "sales" time. Third, Plaintiff's pattern of clocking in and out was not materially different before and after her sales training ended. Before and after the sales job, Dikker appeared to clock in and out for the day, and for routine lunch or smoking breaks. There is no flood of "in" and "out" clocking with the start of the sales job, which would have been necessary to accommodate Dikker's belated

9

version of the time-keeping. The Court notes that even Plaintiff's own efforts to explain the system at trial were very inconsistent and would pose practical problems for any employee and company.

Dikker also fails to establish that Defendants were on notice of the additional hours she claims were not properly compensated. Dikker's claim that she worked many hours off the clock at home is unpersuasive and the Court rejects it. First, Dikker never attempted to record these hours during her employment even though the policy required her to do so. She certainly knew how to correct her time records, and did so multiple times. But she never attempted to have hours she claims to have worked at home recorded. Second, there was no reasonable way for the company to know she was working from home, even assuming she was. The Court has reviewed the log of emails reporting Dikker's use of her company email after regular business hours. The Court has also reviewed the actual emails involved as supplied in a separate exhibit. These materials demonstrate occasional and incidental use of the company's system after regular hours, but fall far short of demonstrating regular and substantial work performed for the company off the clock. The Court sees nothing that amounts to more than routine on-call work that did not significantly interfere with Dikker's personal time, and is therefore not compensable. *See Rutlin v. Prime Succession*, 220 F.3d 737, 743 (6th Cir. 2000) (holding that the FLSA requires employers to compensate an employee for on-call time only where the employee's on-call duties severely restrict the employee's use of her personal time); *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1135 (N.D. Ga. 2004) (holding that "employees are not entitled to on-call pay under the FLSA absent unusually onerous on-call duties.").

Dikker also claims Defendants failed to pay her minimum wage for a Florida rental car conference trip on November 10-11, 2014; a day of training in Detroit on July 18, 2014; and

additional end-of-employment hours she reported after her employment terminated. For reasons similar to those already articulated above, the Court finds that Dikker's allegations regarding these hours fail to establish violations of the FLSA. As to the Florida trip, the Court finds that no more than four hours on Monday and Tuesday were compensable. The rest of the time was free time. Even assuming Dikker worked these hours, she never reported these hours and the balance was more than made up in personal expenses paid by the company on that trip. *See* 29 U.S.C. § 203(m) (providing that employers may include the reasonable cost of servicing meals, lodging, or other facilities in employee wages for purposes of the FLSA). Similarly, Dikker never reported the hours she allegedly spent on her "day of training," nor does she provide any other credible basis establishing Defendants' knowledge of improper compensation for those hours. Finally, the Court finds that Dikker's recordings of additional "end-of-employment" hours she claims to have worked are not credible in light of the hours she actually reported clocking in and out on those days and Dikker's failure to provide any persuasive evidence suggesting she was improperly compensated for that time. In short, Dikker has failed to establish by a preponderance of the evidence that Defendants failed to compensate her as required by wage and hour law for any work she performed.[3]

    B.    <u>Fair Labor Standards Act - Retaliation</u>

Section 215(a)(3) of the FLSA prohibits an employer from discriminating against an employee for asserting rights protected by the FLSA. Specifically, that subsection provides that "it shall be unlawful for any person . . . to discharge or in any manner discriminate against an employee

---

[3] The analysis is the same for the state wage and hour claims. *See Arrington v. Mich. Bell Tel. Co.*, 746 F. Supp. 2d 854, 858-60 (E.D. Mich. 2010) (finding that the FLSA and Michigan Workforce Opportunity and Wage Act minimum wage and overtime provisions "largely parallel each other"). For the same reasons the Court finds Plaintiff failed to establish FLSA violations, the Court finds Plaintiff failed to establish a claim under the Michigan Act.

because such employee has filed any complaint or instituted any proceeding under or relating to this chapter, or has testified or is about to testify in any such proceeding . . . ." 29 U.S.C. § 215(a)(3). A plaintiff may establish a claim of FLSA retaliation by presenting direct evidence of retaliation or, as in this case, by using circumstantial evidence to create an inference of retaliation. *McDaniel v. Transcender, LLC*, 119 F. App'x 779 (6th Cir. 2005) (citing *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1394 (10th Cir. 1997)). To make out a prima facie case of retaliation, a plaintiff must show: "(1) that she engaged in statutorily protected activity; (2) that she was subjected to adverse employment action; and (3) that there was a causal link between the protected activity and the adverse action." *Robinson v. Wal-Mart Stores, Inc.*, 341 F. Supp. 2d 759, 762 (W.D. Mich. 2004) (citing *Claudio-Gotay v. Becton Kickinson Caribe, Ltd.*, 375 F.3d 99 (1st Cir. 2004); *Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 940 (7th Cir. 1999)). Plaintiff's claim falters on all three requirements.

Under the first prong, "it is the assertion of statutory rights . . . by taking some action adverse to the company . . . that is the hallmark of protected activity under § 215(a)(3)." *Claudio-Gotay*, 375 F.3d at 102 (quoting *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996)). This assertion of statutory rights may be informal or unofficial. *EEOC v. Romeo Comm. Schs.*, 976 F.2d 985, 989 (6th Cir. 1992). However, a "plaintiff's expressions of concern or discomfort or frustration over her employer's wage and work hour reporting practices . . . do not amount to the requisite adversarial assertion of statutory rights." *Robinson*, 341 F. Supp. 2d at 763. Instead, a plaintiff's complaints must "clearly raise an FLSA issue." *Jafari v. Old Dominion Transit Mgmt. Co.*, 913 F. Supp. 2d 217, 226 (E.D. Va. 2012).

The Court finds that Dikker did not engage in statutorily protected activity for purposes of her retaliation claim under the FLSA. Dikker never filed a complaint or instituted any proceeding under or related to the FLSA. Nor does she claim to have testified in any such proceeding. In fact, Dikker did not even claim that she ever expressed concern or discomfort about K&M's wage and hour reporting practices. Instead, the extent of Dikker's testimony was that she had informal conversations with Missy Willman about her need to make more money. Making too little, however, does not rise to the level of statutorily protected conduct for purposes of an FLSA retaliation claim. In the conversations at issue, Dikker did not reference Defendants' pay structure or any other specific wage or hour policy, much less connect these to an FLSA issue. Defendants' testimony confirmed that they never received any wage and hour complaint from Plaintiff, and the Court credits this. Accordingly, Dikker is unable to satisfy this essential element of her FLSA retaliation claim. *See Jafari*, 913 F. Supp. 2d at 226; *Robinson*, 341 F. Supp. 2d at 763.

Even if Dikker had engaged in protected conduct, the Court finds that she has failed to establish that she was subjected to an adverse employment action. "[N]ot everything that makes an employee unhappy is an actionable adverse employment action." *Bass v. Bd. of Cnty. Comm'rs*, 256 F.3d 1095, 1118 (11th Cir. 2001) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437 (7th Cir. 1996)). "To be considered an adverse employment action . . . , the action must either be an ultimate employment decision or else must meet some threshold level of substantiality" to constitute constructive discharge. *Stavropoulos v. Firestone*, 361 F.3d 610, 616-17 (11th Cir. 2004). "When an employee voluntarily quits under circumstances insufficient to amount to a constructive discharge, there has been no adverse employment action." *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 775 (4th Cir. 1997).

No adverse employment action took place in this case because the Court finds by a preponderance of the evidence that Dikker quit, and was not fired from or forced out of her job. Dikker arranged a meeting with Paul Vredeveld, the general sales manager at 5-Star Team Leasing, and Willman, the general manager. Vredeveld and Willman's consistent and unequivocal testimony was that Dikker told them "I'll make this easy, I'm quitting" and that their response was that they were "on the same page." Dikker's current allegation to the contrary is unconvincing. In fact, she confirmed at trial that she told Vredeveld and Willman at the meeting that she would "make it easy" for them. Additionally, the fact that Dikker uploaded her resume on the internet the day before this meeting further supports the Court's finding that Dikker quit, and was not fired. Because the Court finds that Dikker voluntarily quit her position and was not constructively discharged, she has failed to establish that she was subjected to an adverse employment action, *see Hartsell*, 123 F.3d at 775, falling short of the second prima facie element too.

Of course, without protected activity or adverse employment action, there is no possible causal link to consider. Without establishing any element of the prima facie case, Plaintiff fails to carry her burden on the retaliation claim.

C. Commissions

Under Michigan law, "whether an agent or broker . . . is entitled to commissions on sales made or consummated by his principal or another agent depends upon the intention of the parties and the interpretation of the contract of employment, and that, as in other cases involving interpretation, all the circumstances must be considered." *Reed v. Kurdziel*, 352 Mich. 287, 294; 89 N.W.2d 479 (1958). But "[w]here the contract is silent, the agent is entitled to recover a commission on a sale,

whether or not he personally concluded it, only where it can be shown that his efforts were the "procuring cause." *Id.* at 295, 89 N.W.2d 479.

### 1. Contract

The parties' contract states that the commission schedule at K&M for "GDP" vehicles was $25 per vehicle at the time of the order and $40 at the time of delivery.[4] The contract does not provide for post-termination commissions. The Court finds that the parties intended to provide for post-termination commissions if and only if Dikker actually completed all the work necessary to complete the order or delivery at issue. This was how Defendants handled the post-termination commissions for Dikker's predecessor in the position. Ms. Peila was paid commissions because she completed the post-termination paperwork.

The Court finds Defendants did not breach this contract with Dikker. To the contrary, the Court is satisfied that Defendants paid Dikker all the commissions she was due, consistent with the parties' written agreement. The Defendants paid Dikker $25 for every vehicle she ordered and $40 after she completed all the requisite paperwork for a vehicle and it was delivered. Accordingly, Dikker received all the commissions to which she was entitled under the contract.

Dikker's allegations to the contrary fail to establish Defendants breached the contract. Under the parties' agreement, Dikker is not entitled to commissions for thirty-nine sales she claims were "in progress" at the time she left K&M because nineteen of these vehicles were never even ordered, and the other twenty were not ordered during Plaintiff's employment with K&M. The contract does not provide for commissions on orders or deliveries that occur after termination of employment.

---

[4] The commission schedule for "Risk Units" was the same as for "GDP" vehicles, but "any markup over $300 is paid at 25%." There are no "Risk Units" at issue in this case.

Plaintiff is also not entitled to delivery commissions on the sixteen vehicles that were ordered prior to her termination because she never completed any of the paperwork for these sales.[5] The order commission she did receive on these units fully compensates her under the contract. Plaintiff fails to establish by a preponderance of the evidence that Defendants breached the contract.

### 2. The "Procuring Cause" Doctrine

Defendants are also not liable for those commissions under the "procuring cause" doctrine. "The law in Michigan is that sales agents are entitled to post-termination commissions for sales they procured during their time at the former employer." *Stubl v. T.A. Sys., Inc.*, 984 F. Supp. 1075, 1095 (E.D. Mich. 1997). The procuring-cause doctrine was first enunciated in *Reed v. Kurdziel*, 352 Mich. 287; 89 N.W.2d 479, where the Michigan Supreme Court held that the doctrine applies when the parties enter a contract governing the payment of sales commissions, but the contract is silent about the payment of post-termination commissions. *See id.* "Michigan cases . . . [however,] interpret the concept of 'procuring cause' quite narrowly." *Roberts Assoc., Inc. v. Blazer Int'l Corp.*, 741 F. Supp. 650, 655 (E.D Mich. 1990). Under the procuring-cause doctrine, a sales agent is ordinarily entitled to a commission on sales submitted by a customer after the salesperson's termination if the sales agent was responsible for securing the sale. *Reed*, 352 Mich. at 294-95; 89 N.W.2d at 483. However, "in the usual case each subsequent order will require some further customer services, and under those circumstances the agent securing the previous order will have no claim for additional commissions." *Roberts Assoc.*, 741 F. Supp. at 655. It is for the fact-finder to determine "whether subsequent

---

[5] A considerable amount of paperwork was required for each vehicle sale, the most of which occurred at the time of delivery. This included the preparation, completion, and signing of individualized title, lien, odometer, and financing documents for each vehicle.

purchases were effectuated by additional customer services or were made solely on the force of the original representations." *Id.*

As an initial matter, the "procuring cause" doctrine is inapplicable here because the parties have a written contract that does not provide for post-termination commissions at all. Even if the "procuring cause" doctrine applied, however, Dikker has failed to establish by a preponderance of the evidence that she was the "procuring cause" of any of the sales at issue. Dikker could not have been the "procuring cause" of nineteen of the thirty-nine sales she claims responsibility for because, as noted above, those vehicles were never ordered. As to the other twenty sales that were eventually realized, the Court finds that Dikker was not the procuring cause within the meaning of Michigan law. *See Fernandez v. Powerquest Boats, Inc.*, 798 F. Supp. 458, 463 (W.D. Mich. 1992) (holding that plaintiff was not procuring cause where "no evidence has been presented by either party concerning [p]laintiff's involvement with the 39 post-termination boat sales"); *Roberts Assoc.*, 741 F. Supp. at 655. Others performed work necessary to complete the transactions. Finally, Dikker is not entitled to the delivery commissions for the sixteen vehicles that were ordered during her employment because the deliveries on those vehicles all occurred after Dikker's employment ended and she did not complete the necessary delivery paperwork. As discussed above, the majority of the work involved in making a sale occurred during the "delivery" stage of the sale. Accordingly, she was not the "procuring cause" for the sale of those vehicles. *See Fernandez*, 798 F. Supp. at 463; *Roberts Assoc.*, 741 F. Supp. at 655.

### 3. Michigan Sales Representatives Commissions Act

Michigan courts have held that the MSRCA does not "create a new obligation or impose a new duty" to pay sales commissions, and that a defendant "who is not liable under the common law

is not liable under the [M]SRCA." *Flynn v. Flint Coatings, Inc.*, 230 Mich. App. 633, 584 N.W.2d 627, 629 (1998). Rather, this act merely "changes the remedy for failure to pay sales commissions." *Id.* Because this Court finds that Plaintiff is not owed any commissions under common law, her claim under the MSRCA likewise fails. *See Clark Bros. Sales Co. v. Dana Corp.*, 77 F. Supp. 2d 837, 852 (E.D. Mich. 1999).

Even if Plaintiff's MSRCA claim were not precluded on those grounds, however, the MSRCA is inapplicable here because Dikker earned lump sum commissions of either $25 or $40 (or both) per vehicle; she did not earn or claim to earn any commission based on a percentage of the sales revenue generated. But the percentage commission is the only one covered by the MSRCA. *See* MCL 600.2961(1)(a) (defining "commission" as "compensation accruing to a sales representative for payment by a principal, the rate of which is expressed as a percentage of the amount of orders or sales or as a percentage of the dollar amount of profits."). The Act has no application to piece rate commissions like those at issue here. *See Tech. Sales Assocs., Inc. v. Ohio Star Forge Co.*, No. 07-11745, 2009 WL 728519, at *7-*8 (E.D. Mich. Mar. 19, 2009) (interpreting the MSRCA and finding clear language indicates no intent to include in the definition of "commission" compensation on a "per part" or "per piece" basis).

### III. CONCLUSION

Dikker has failed to establish any of her claims at trial by a preponderance of the evidence. The Court will enter judgment accordingly.

Dated:     March 17, 2017              /s/ Robert J. Jonker
                                       ROBERT J. JONKER
                                       CHIEF UNITED STATES DISTRICT JUDGE